96 F.3d 1449
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Hinton McClure WATERS, Defendant-Appellant.
 No. 95-6088.
 United States Court of Appeals, Sixth Circuit.
 Aug. 29, 1996.
 
 Before: MARTIN, KRUPANSKY, and DAUGHTREY, Circuit Judges.
 PER CURIAM.
 
 
 1
 The defendant, Hinton Waters, was convicted after a month-long jury trial and sentenced to life plus a consecutive term of 51 years in prison, based on various charges stemming from his participation in a conspiracy to mail bombs and threatening correspondence to the Knox County District Attorney General. He appeals his conviction on four grounds, contending (1) that the evidence is legally insufficient to convict; (2) that the district court erred in failing to declare a mistrial after improper comment by the prosecutor in his closing argument; (3) that the district court should have permitted the defendant to stipulate his status as a convicted felon; and (4) that the district court impermissibly broadened the scope of the indictment in its charge to the jury. We find no reversible error and affirm.
 
 I. FACTUAL AND PROCEDURAL BACKGROUND
 
 2
 The conspiracy in this case stems from the relationship of defendant Waters and Robert Lee Sands. Waters, having been convicted of second-degree murder, was serving his sentence in a Florida prison where he was housed with Robert Sands between 1987 and 1988. Sands had been sentenced in Union County, Tennessee, to three life terms for murder, armed robbery, and kidnaping, but had been transferred to the same Florida prison. When Waters was released from prison, he went to live with his mother in Lawrenceville, Georgia, and found work at National Business Solutions, Inc. Sands was eventually placed in a Lake County, Tennessee, prison.
 
 
 3
 Waters and Sands continued to communicate by telephone after Waters was released, and their conversations were routinely recorded. They frequently discussed Sands's lack of success in getting post-conviction relief and, according to the government's theory, hatched a plan to secure Sands's release through another route. Hence, in a January 23, 1994, conversation, Sands told Waters that he possessed a letter, written on Ku Klux Klan stationery, revealing a plot to bomb the Knoxville City-County Building. Soon thereafter, on February 2, 1994, Knoxville newspaper reporter Stan Delozier received from Sands a copy of a letter on Ku Klux Klan letterhead. The letter, signed by "S.M." and addressed to "J.W.," described a plot to bomb the City-County Building as a message to the "justice system." After sending copies of the letter at Sands's request to Waters and Sands's former attorney, Judge Bob McGhee, with whom Sands periodically conversed, Delozier gave the letter to the F.B.I. Sands also told the associate warden of the prison that he had sent Delozier the letter and offered to investigate the authors of the letter. With Sands's clues, the associate warden found the names of Eddie McMillan and Frank Weaver, whom Sands then implicated in the bombing plan.
 
 
 4
 In early February, Waters and Sands spoke several times by phone and planned a meeting at the Lake County prison, describing their meeting as a "council of war." After indicating that he was not helping the authorities with the letter, Sands said that "if they wanta come to me with somethin', then we'll talk turkey." Waters agreed, suggesting that "[t]here's no sense in foolin' with it if you can't get somethin' out of it." Sands asked the associate warden for a special meeting with Waters, whom he identified as a minister, and Waters also wrote the associate warden to request a meeting with Sands. The associate warden approved the meeting in order to obtain Sands's cooperation with the bombing investigation, although the meeting was not supposed to be private. Waters asked and received from his employer a $200 advance for a "prison ministry" trip to Tennessee. On February 18 and 19, Waters, wearing a clerical collar, met with Sands for about two hours each day. The second of the two meetings occurred in private.
 
 
 5
 Two days after these visits, someone purchased nails, a mastic called Liquid Nails, and keys from the hardware store located in front of Waters's home. On the same day, Sands called Bobby McGhee to tell him that the bombing plot he had previously described might be accelerated, depending on the sentencing of a man named Tim Gose. After McGhee reported this call, state investigator Ted Childress called Sands for more information. Sands referred Childress to Waters for information. When Childress called Waters, treating Waters as if he was a minister who might have knowledge of a possible bombing, Waters said that Sands would reveal the identity of the bomber if he was released from prison.
 
 
 6
 On February 27, Waters spoke again with Sands, telling him that the bomb plot was "for real" and that the bombers would "isolate some targets" or else no room would be left for an "encore." On March 1, a mail carrier delivered a parcel, postmarked February 26 from Chattanooga, to District Attorney Nichols in the Knoxville City-County Building. Suspicious of the package, Nichols's office called the return addressee, Russ Dedrick, who said that he had not mailed such a package. The bomb squad then x-rayed the package, determined it to be a live bomb, and used a "water cannon" to destroy its effectiveness.
 
 
 7
 On March 2, Waters and Sands again spoke, discussing Sands's negotiations with the authorities and his insistence on gaining his freedom in exchange for information on the bombing. The following day, Sands asked fellow inmate Bobby Joe McMurray to copy a letter in exchange for cigarettes. This letter, purportedly to "J.W." from "Bobby," acknowledged the first bomb's failure and suggested a second attempt at the homes of the targets. Also on that day, Sands told Waters that he had "the key to the lock." On March 4, Sands gave the new letter to the authorities. A subsequent search of Sands's cell revealed a copy of the letter in handwriting different from McMurray's.
 
 
 8
 During a March 24 conversation, Waters and Sands joked about investigators' suspicions that they were involved in the bombing. Waters suggested that "[m]aybe [Sands] opened up [his] shotgun shells" to get powder for the bombs.
 
 
 9
 On April 29, after Waters had been terminated from National Business Solutions, employees at Waters's office discovered a letter left on the copy machine after the secretary had turned the machine off when she left the previous day. The letter, addressed to District Attorney Nichols, stated: "Found Sands. Won't be long before he hears taps. Who will be next? Maybe whole families." Office personnel turned the letter over to investigators, who on May 2 intercepted an identical letter in the mail to Nichols. Also intercepted was an oily stained package with no return address, smelling of mothballs and diesel fuel. The address label on the package was identical in all respects to the computer-generated label on the envelope that contained the letter. The bomb squad determined that the package would explode, and "disrupted" it with a water cannon.
 
 
 10
 On May 3, postal inspectors searched Waters's garbage, finding green dental floss and a vacuum cleaner bag containing a receipt for batteries. A subsequent search of Waters's home uncovered various materials, such as copper tubing, green floss, batteries, solder, and electrical tape, that were later determined to be similar to materials recovered from the bombs. During the search, Childress and a postal inspector asked Waters to speak with them about any information about the bomb plot. Waters stated that they "couldn't prove that [he] was involved," and told them to "tell me what you know about these bombs." Waters eventually said that he "didn't try to hurt anyone in Tennessee." However, after agents told Waters that he made a mistake by leaving the letter on the copy machine at National Business Solutions, Waters turned pale, began to shake, and vomited. He then asked for an attorney, after saying that he lacked the expertise to build a bomb.
 
 
 11
 An expert at trial testified that the KKK letter was written by the same person who addressed the first package, although neither Sands nor Waters could be identified as the writer. However, Waters's handwriting was identified as similar to the writing of the word "powder" on a legal pad with a diagram. Another expert identified the diagram as a drawing of a bomb similar to the one first sent to the City-County Building. An Eastman Kodak engineer responsible for the design of Kodak's teledisc camera testified that parts missing from a camera found at Waters's home were the same as damaged teledisc parts contained in the first bomb. A clothespin manufacturer testified that clothespins found in both bombs and at Waters's home were from the same mold and were now unavailable in the United States. An investigator testified that the clothespin switches in the bombs were common in improvised explosives. He also noted that certain clasp envelopes, pipes, and thumbtacks, dental floss, fence staples, batteries, mothballs, mastic, wires, and clothespins found in Waters's home were similar to those found in the bombs. He noted that copper tubing in the second bomb and tubing in Waters's home were cut with the same tool.
 
 
 12
 Waters was charged in a superseding indictment with conspiracy to transport and mail the explosives with the intent to injure or kill another and conspiracy to use a firearm in relation to a crime of violence. He was also charged with two counts of "knowingly and with intent to kill and injure another, ... deposit[ing] for mailing and delivery and caus[ing] to be delivered by mail" an explosive; two counts of "knowingly ... transport[ing] and caus[ing] to be transported in interstate commerce an explosive"; two counts of "knowingly ... us[ing] a firearm ... during and in relation to a crime of violence"; two counts of "knowingly transport[ing] and caus[ing] to be transported in interstate commerce an explosive" after having been convicted of a felony; and, finally, one count of "knowingly ... deposit[ing] and caus[ing] to be deposited" in the mail a threat to injure Randy Nichols. The jury convicted Waters of all counts, and the trial court sentenced Waters to life in prison, followed by a consecutive term of 51 years.
 
 II. ANALYSIS
 
 13
 A. Sufficiency of the Evidence. The defendant first argues that the superseding indictment, because it is worded in the conjunctive rather than the disjunctive, alleges not only that he caused certain substantive acts to occur, but that he actually committed those acts. He insists that the government failed to prove that he committed those acts himself. Waters observes that the government, through the testimony of Al Adams, acknowledged its uncertainty about whether Waters actually transported or delivered any package involved in this case. On cross-examination about the possibility of Waters carrying the bomb to Chattanooga for mailing, Adams stated, "Well, we're not even sure he, if he did go, whether he went in the Plymouth or the station wagon." The defendant interprets this statement as the government's acknowledgment that it could not prove that he actually transported a bomb.
 
 
 14
 As the prosecution points out, Waters's argument stems from the misconception that he can only be convicted of the crimes charged if he actually transported and mailed the bombs himself. However, under 18 U.S.C. § 2:
 
 
 15
 (a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.
 
 
 16
 (b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.
 
 
 17
 Even when this "aiding and abetting" statute is not explicitly charged and one is indicted as a principal, one can be convicted upon evidence of aiding and abetting. Standefer v. United States, 447 U.S. 10, 19 (1980). Thus, proof that Waters himself mailed the bombs was unnecessary if sufficient evidence showed that Waters aided and abetted in the transportation and mailing of the bombs.
 
 
 18
 Viewing the evidence in the light most favorable to the government, as required by Jackson v. Virginia, 443 U.S. 307 (1979), we conclude that ample evidence supports the convictions on all counts. Waters's phone calls and meetings with Sands, his motivation to help Sands get out of prison, and the fact that Sands guided Childress to Waters for identification of the bomber all point to Waters's involvement in the bombing conspiracy. The diagram and materials found in Waters's home suggest his participation in the making of the bomb, and Waters's discussion with Sands about the bombing the day after the bomb was mailed, but before it arrived, points to his active participation in the mailing. Finally, Waters is linked to the conspiracy by the threatening letter found on the NBS copy machine and mailed to the District Attorney from Chattanooga. The fact that the letter, so clearly tied to Waters, was mailed from Chattanooga also suggests that Waters chose Chattanooga as the mailing location for the bombs. Finally, the address label on the package containing the second bomb had obviously been prepared by the same person who prepared and mailed the letter. These facts provide more than sufficient evidence to sustain the convictions on all counts, despite the lack of an eyewitness to the mailings.
 
 
 19
 B. Prosecutorial Comment. In rebuttal, the prosecutor asked the jury:
 
 
 20
 Did you wonder, ladies and gentlemen, as you heard the evidence in this case, what innocent explanation there might be for Hinton Waters to say, on January 1, 1993, as he said, and as you heard, words to the effect: "The state of Tennessee just doesn't seem to want to do the right thing. You have to put a stick to their head."
 
 
 21
 After defendant's objection was overruled, the prosecutor continued by asking, "What's the innocent explanation for that kind of a statement, ladies and gentlemen? Have you wondered throughout the presentation of evidence in this case where the alibi is, where--" Defense counsel immediately objected to the mention of the absence of an alibi and moved for mistrial. The prosecutor, however, claimed to be responding to the defense counsel's opening argument, in which he stated:
 
 
 22
 The evidence will show you that Hinton Waters was not in Chattanooga, Tennessee, on the 26th day of February of 1994. Unequivocally the evidence will show you that. The government knows that he wasn't in Chattanooga, Tennessee, and the witnesses hopefully will tell you that when the second device was mailed, because Hinton Waters was being surveilled.
 
 
 23
 Because the defendant had already suggested that an alibi would be forthcoming, the court denied the motion for mistrial. However, it instructed the jury that the defendant was not responsible for proving anything, including an alibi; that the government maintained the burden of proof; and that counsel's arguments were not evidence. The defendant argues that the district court abused its discretion by refusing to grant a mistrial after the prosecutor called the jury's attention to the absence of an alibi.
 
 
 24
 In Griffin v. California, 380 U.S. 609 (1965), the Supreme Court held that when the government comments upon a criminal defendant's failure to testify, it violates the defendant's Fifth Amendment right not to testify against himself. This prohibition extends to comments about the defendant's failure to produce evidence. United States v. Drake, 885 F.2d 323 (6th Cir.1989), cert. denied, 493 U.S. 1049 (1990). But, as the Drake court observed, while prosecutors may not comment specifically on the defendant's failure to produce evidence, "[t]his does not mean, however, that a prosecutor cannot summarize the evidence and comment upon both its quantitative and qualitative significance." The court continued:
 
 
 25
 Arguably, every time a prosecutor says "the evidence is overwhelming" or "the evidence is 100 percent," or "every witness who testified told you the same story," it could be construed as highlighting the fact that the defense produced no contrary evidence. Yet, such comments are certainly proper. The government is not forbidden to comment on the strength of its proofs; otherwise we take the "argument" out of closing argument and reduce it to a flaccid resume of the evidence. We must not lose sight of the fact that what is sought to be prevented is the government conveying to the jury that a defendant is under some kind of duty to testify or produce evidence.
 
 
 26
 Id. at 324. The court then noted four factors to be used in reviewing claims of improper comment: (1) whether the comments were "manifestly intended" to reflect on the accused's silence or failure to put on proof; (2) whether the remarks were isolated or extensive; (3) whether the evidence of guilt was overwhelming or slight; and (4) whether and when the court gave curative instructions. Id.
 
 
 27
 In this case, while the prosecutor's mention of the absence of an alibi was imprudent and must have been intended to reflect on Waters's failure to put on proof of his whereabouts when the bomb was mailed, the other factors weigh against reversal. The remarks were isolated; the evidence of guilt was certainly overwhelming; and the court immediately gave a curative instruction clarifying the burden of proof. Thus, measured by the Drake standard, the comment was not improper.
 
 
 28
 In addition, when a defendant suggests to the jury that he will testify or put on proof, and then fails to do so, the prosecutor may comment on that failure. In Lockett v. Ohio, 438 U.S. 586, 594-5 (1978), the defense counsel had outlined a defense and stated that the defendant would testify, but the defendant later decided not to testify. When the prosecutor then referred in closing argument to the "unrefuted" and "uncontradicted" proof, the Court refused to find a Griffin violation, concluding instead that the prosecutor's remarks were not unfairly prejudicial in light of the fact that the defendant had promised to testify but did not. Id. at 595. This court relied on Lockett in Butler v. Rose, 686 F.2d 1163 (6th Cir.1982) (en banc), a case in which a college student accused her professor of rape. At trial, the defense attorney promised the jury that the proof would establish consent, but no evidence of consent was offered. Although the prosecutor clearly commented on the defendant's failure to testify, the court refused to find a Griffin violation because the defense "gave the jury reason to believe they would hear from the defendant." Id. at 1173. Similarly, in this case, Waters had promised that the evidence would show that he was not in Chattanooga on February 26, 1994. The prosecutor was justified in pointing out that Waters had not, after promising to do so, shown that he was not in Chattanooga on February 26.
 
 
 29
 C. Stipulation of Status as a Felon. Having been convicted of two previous felonies, Waters moved to stipulate to his status as a felon in order to prevent the government from introducing the nature of the offenses and his sentences. The district court denied the motion, and the government introduced evidence of the nature of both convictions and the sentences that Waters received, over his objection.
 
 
 30
 The defendant points to cases in other circuits requiring a district court to permit stipulation in circumstances such as those in this case. However, this court is bound by the precedent established in United States v. Burkhart, 545 F.2d 14, 15 (6th Cir.1976), a case involving the possession of a firearm by a felon. In Burkhart, we held that the government was not required to accept the defendant's stipulation that he was a felon and was not required to limit its proof to evidence of only one felony. See also United States v. Blackburn, 592 F.2d 300, 301 (6th Cir.1979); United States v. Ward, 81 F.3d 162 (6th Cir.1996) (per curiam).
 
 
 31
 D. Jury Instructions. As noted previously, the defendant was charged in the superseding indictment with two counts of "deposit[ing] for mailing and delivery and caus[ing] to be delivered by mail" a bomb, two counts of "transport[ing] and caus[ing] to be transported in interstate commerce an explosive," and one count of "deposit[ing] and caus[ing] to be deposited" in the mail a threatening communication. The defendant argues that although the indictment was phrased in the conjunctive, the court charged the jury in the disjunctive, thereby constructively amending the indictment to broaden the charges and make it easier to convict. He insists that he defended only against charges that he actually deposited the bombs, transported the bombs, and mailed a threatening letter.
 
 
 32
 The law is clear that the district court did not impermissibly amend the indictment. In United States v. Murph, 707 F.2d 895, 896 (6th Cir.) (per curiam), cert. denied, 464 U.S. 844 (1983), we held that "[i]t is settled law that an offense may be charged conjunctively in an indictment where a statute denounces the offense disjunctively." In that case, the trial court had instructed the jury that the defendant was charged with submitting a tax return known to be "false, fictitious, or fraudulent," although the indictment had charged the crime in the conjunctive. Because the statute was written in the disjunctive, the court refused to find an impermissible variance. Similarly, in United States v. Hathaway, 798 F.2d 902 (6th Cir.1986), the indictment charged the defendant with receiving checks through the mail, knowing them to have been "stolen, converted, and taken by fraud," but the trial court instructed the jury in the disjunctive. The court upheld the conviction, finding that "an impermissible variance does not occur when, although an indictment charges several acts in the conjunctive, the district court charges the jury in the disjunctive." Id. at 913. See also United States v. Miller, 471 U.S. 130, 136-7 (1985). In light of this precedent, we hold that the district court in this case did not err by instructing the jury with language in the disjunctive, despite the conjunctive language of the indictment, because the statutes at issue are written in the disjunctive.
 
 
 33
 For the above stated reasons, the judgment of the district court is AFFIRMED.